May it please the court, Richard Callahan appearing on behalf of Mr. Chhun. Yasith Chhun is in Canaan, Pennsylvania, working on approximately eight and a half years in custody on his life sentence in this matter. What I would like to do, Your Honor, in the time that I have is first reserve ten minutes, if I may, and also try to limit the focus of the opening argument on certain issues that I felt may need some fleshing out from the papers. The first is, excuse me, the statute of limitations argument. Now, in this argument, Your Honor, the government has admitted error, page 76 on their brief. There are 12 overacts alleged in this case between counts two and three. And I don't have a chart, but I can just sort of maybe even visualize it. You have six overacts that are out of statute. They predate the date in which the statute of limitations were begun to run. There are six within the statutory time frame. Overact seven is travel to Thailand. Overacts eight and nine involve the purchase of a ham radio. And overacts 10 through 12 occurred in conjunction with Operation Volcano on November 24th. Our argument is that using Fuchs as a lead, there was insufficient evidence by which we can tell whether or not a jury, the jury may have relied or probably did rely on overacts that are outside the statute. The reason I argue that, and strongly in this case, is because counts two and three, as the Court is aware, punishes the agreement. They are conspiracy counts. They punish the agreement, not the result and not the object of these conspiracies that occurred out of the country. The agreement under both counts two and three must have been formed in the United States. That's in the statute, both 956B and 960. And there's no evidence of that? I'm sorry? And there is no evidence of that? There is evidence that he was in the United States. The only issue is when he left and whether or not the overacts in relation to that time in the United States are within the statute. And my question remains, is you're saying there is no evidence of an agreement within the United States? I am not saying that. Oh. Forgive me, I'm not. All right. There was an agreement. There was a disputed trial as to what that agreement entailed. But as far as whether or not there is agreement, we are not contesting that for purposes of this proceeding. But the agreement had to be in the United States. And when you look at the overacts in relation to counts two and three, which talk about the agreement planning to set foot in a foreign country, those overacts involving fundraising, which is specifically stated as a primary motivation for count two, planning, meeting, those overacts are exclusively focused in the beyond statute period. And counsel, we review this issue for plain error, correct? That's correct. But I think a reasonable jury faced with these charges, and with what they are required to find under counts two and three, would have focused on those acts that occurred when Mr. Chin was in the United States. I think that's just common sense. Because that's when the agreement had to take place. And I think it's fair to believe or fair to assume that the jury would have found a fundraiser on the Queen Mary, clearly satisfying the elements of the offense, and moved on. There was really no need for the jury to inquire and debate overacts for these counts that are beyond the time that Mr. Chin left for Thailand. The agreements had to have been made in the United States. Those overacts are universally outside the statute of limitations. And if they relied on any of those, then we have a future. But I'm having some trouble conceptually with your argument for the following reason. If there's an agreement made, and the overt acts that are in pursuit of that agreement, if the agreement is made in the United States, with all the requisite intent and all the things that the statute requires, is it your argument that an act occurring outside the United States cannot count as an overt act demonstrating the agreement? Is that your argument? My argument, that was my, that's the one I'm coming to now, which is, my first argument is a common sense argument that this is where the jury would have looked to support the agreement. The second argument on this point is a legal argument. And that is, we have sort of a competition here of two doctrines. One is the statute of limitations, which we are discussing. But the other one, which rears its ugly head in both statutes, is a jurisdictional requirement. Well, but the jurisdiction exists because the conspiracy occurs in the United States. By definition, it's a conspiracy to do a crime elsewhere, because that's the whole point of the statute, that we don't want to be the hotbed for people to sit around and plan other people's murders somewhere else. So the jurisdictional hook is the making of the agreement here. And what I'm having difficulty with is why an overt act demonstrating the agreement isn't permissible. And that seems to be where you're headed with this, because you started by saying that the overt acts that are within the statute are primarily things that took him outside the country or that occurred outside the country. But insofar as they are merely demonstrations of the seriousness of his intent here to engage in a conspiracy, I'm not sure why that matters. I'm just saying, I think from a common-sense jury perspective, without having an instruction on the issue, they would be more inclined, common-sense standpoint, to focus on the earlier overt acts that support the agreement. Now, that first agreement doesn't preclude other overt acts by definition. However, my second legal argument does preclude them, and I'll explain. You have a statute of limitations that began to run on May 31st of 2000. Combined with that, we have the jurisdictional hook on both 956B and 960 that the conspiracy has to be in the United States. So what happens then is that the jury was instructed on both counts that they had to find that he was within the United States, even though the objects are outside the United States. But here's where the conspiracy and the jurisdiction collide, Your Honor. In a conspiracy case, a conspiracy statute of limitations typically commences upon the last overt act and furtherance of the conspiracy. That's established Supreme Court and circuit law. But here, the statute began to run when Chun left the United States on May 31st. That's agreed to by the parties. That's six months before Operation Volcano at the end of November. So we have six months of overt acts that are taking place while the statute of limitations is already running. And why is it running? It's running because under those statutes, especially 956B, which is more clear on this, actually, because it is itself a conspiracy statute. Once Mr. Chun left the United States, that conspiracy for 956B purposes ended as a matter of law. Okay. You're saying the statute began to run on May 31st, 2000. So anything, so the overt acts, you're saying, have to be after that date? The overt acts to be successful would have to be outside after that date. After that date. But the government, they cannot do it. Well, wasn't there in August of 2000 a letter that was part of the record in which your client wrote to somebody and said, boy, they may be alive now, but they're not going to be alive long or something along those lines? Wouldn't that be at least one example of something that happened after the May 31st date? Yes. But my point is, on this argument, Your Honor, is that that occurred after Mr. Chun had already left the country. And under the statute, under 956B and 960, once that, once he left the country, the statute had been satisfied and had been legally completed. The only reason we know that is because the statute of limitation is running at that time, as these overt acts, which are supposed to be in further ance. But all they are is, they are demonstrations that the conspiracy existed here in the United States. They don't have to be done here in the United States. I disagree with that on, under those statutes, because, because the acts, the conspiracy has to occur in the United States, and the statute of limitations began when he left, those overt acts are taking place as the statute is already running. When, if they were actually in furtherance of the legal conspiracy. So in your view, someone could completely escape the reach of this statute by sitting in Niagara, New York, and making a conspiracy, sitting around saying, let's go kill the Prime Minister of Canada, and then run across the border and buy all the stuff that's needed, come back to the United States and go back and forth, you know, 15 times, and all of that is beyond the reach of this statute because the overt acts occurred in Canada? If he was in the United States at the time, at part of those times when the overt acts were occurring, that would be within the statute. Well, my hypothetical was that it was just simply convenient for him to commit all the overt acts elsewhere, but the actual conspiracy was made here. I would, with that hypothetical, I think that those overt acts would fit within the statute as long as it was when Mr. — when the defendant in your hypothetical was within the country. But it seems illogical to me, just as a matter of law, that if the law in this circuit and the Supreme Court says the conspiracy continues until the last overt act, then the statute begins. Here we've got the statute beginning as he leaves the country. You have overt acts still going on. How could they be in furtherance of that same conspiracy if the statute is already running? Counsel, you're down to about 8 minutes. You said you wanted to reserve 10. I appreciate it very much, Your Honor. Very well. We'll hear from the government. Good morning. Jean-Claude André on behalf of the United States. The government does not agree with Mr. Callahan that the statute of limitations — that the key date for statute of limitations purposes is May 31, 2010, because that is when Mr. Chun left the United States. That date is the key date, because that is 5 years before the first supersede — sorry, the original indictment in this case was filed. And so when this Court engages in a statute of limitations analysis, it doesn't look at the conduct and move forward. It looks at the filing of the charging instrument and then moves backward in time to see whether there was conduct that was timely when you have a continuing offense, as you do here. Okay. Give us those relevant dates, then. May 31, 2000 was the date that we believe is operative, but not because that's the date Mr. Chun left the United States, but that's because that's 5 years before the May 31, 2005 original indictment in this case, which we then subsequently superseded to add the weapons of mass destruction. And the conspiracy was ongoing from that point forward? Yes. Yes, Judge Graber. It was — it's our position that it was formed early on, well before 2000, in the United States with the Long Beach fundraisers, and in fact, then continued onward well up until the attacks in Cambodia in 2000 of November, November 2000. And in fact, that it also went even further, as the district court found, in that the defendant was planning a second similar attack. And so this conspiracy is a straddle conspiracy. It straddles the operative date, but it's not that Mr. Chun's departure somehow ended the 956 and 960 conspiracy and then led to some other conspiracy once he was over at the Thailand-Cambodia border that the United States can't prosecute. To this end, Judge Graber, we think your questions to Mr. Calhoun were dead on. You formed the conspiracy in the United States to do something abroad, and then the relevant question is, is that conspiracy still alive inside the statute of limitations? And it clearly was. The travel itself to the Cambodia-Thailand border on May 31, 2000, that was charged as an overt act, and the government proved it overwhelmingly. And then not only was there the August 2000 letter that you referenced, Judge Graber, there were in fact 17 letters that defendant sent from the Cambodia-Thailand border when he was running HQ3, his third headquarters. Those are all listed in pages 83 and 84 of our brief. And so we also proved that overt act overwhelmingly. And so while it was a mistake for Judge Pragerson not to instruct the jury to find at least one overt act inside the statute of limitations, there clearly is no prejudice here insofar as the fact that we overwhelmingly proved at least one of those overt acts. In fact, we overwhelmingly proved two. And moreover, they are two that go to the heart of the conspiracy. And those two are? We called it overt act 7 in that it was overt act number 7 charged in all the counts, and then we also called one unique overt act 1 because it was only charged in the my apologies, I forget precisely what count we charged it in. But it's all laid out in roughly pages 82 to 84 of the government's answering brief. So these factual distinctions take this case apart from Fuchs, and I think it probably is the easiest way for this Court to resolve this issue. We've also made the alternative argument that this Court could look to the Carlson decision, which postdates Fuchs by about five months. And in Carlson, the analysis that the Court employed was simply to look at whether there was ample evidence of an in statute overt act. Admittedly, there's some tension between those two decisions, but I would like to point out one thing that the defendant referenced in his reply brief, which is that Carlson wasn't a conspiracy case. That's true. In our view, that's irrelevant, however, because Carlson was a continuing offense case as well. It was tax evasion. And it was that the defendant in that particular case was taking multiple acts of evasion and then the question became, do you look at when he initially took his first act of evasion or when he continued to do so into the statute of limitations? And this Court had no problem finding no prejudicial plain error in the failure to give a specific unanimity instruction vis-a-vis the statute of limitations, because there was ample, and that's the key word this Court used, ample evidence that the continuing offense of tax evasion continued into the statute. So whether this Court wants to factually distinguish Fuchs for the reasons I've explained or run to Carlson, we think either way is a basis for this Court to affirm. Counsel, I have some concern about the use of this statute. Suppose we're not talking about Mr. Chun. We're talking about a Syrian American who is very upset with what's going on in Syria and organizes a group that's going to join the rebels in Syria, which is consistent with the U.S. policy. We're with the rebels. We're not with Assad. Would the government prosecute? No, the government would not. And unless I'm wrong about my current events, I believe that's because there's a congressional authorization for the use of military force, which I realize is a little more nuanced than what we said in our brief, which is that you would have to have an all-out declared war. But the government would not prosecute someone for doing that, so long as they are acting consistent with congressional authorization for the use of military force, because in our view, that would be, the government would then not be at peace with the foreign country. And so what's the distinction with Cambodia? Wasn't Mr. Chun on the same side as U.S. policy, or was he not? He was not. I mean, the government certainly was not engaging in any overt military actions or even any open and notorious military actions in Cambodia. That's in contrast to what's going on in Syria. So Mr. Chun basically decided to take foreign policy into his own hands, and that's precisely what the statute was intended to deal with. In fact, if you go back to its earliest inspiration, it was when France and Great Britain were warring with each other in 1793, and George Washington, in his inaugural address, said, you know, American people, even though you're probably more loyal to France because we just had this huge fight with Britain, and in fact, I'm aware, you know, in some domestic ports, we are allowing French privateers to come in and refuel and rest. We can't engage in any conduct that could be viewed as taking sides, because we are not at war with either country. Okay, but here we have a life sentence for somebody who is a patriot, so to speak, of the Cambodian cause, and it just, I find it a little troublesome that this leads to a life sentence in an American prison for someone under these circumstances. Certainly it's a stiff sentence, and I guess if I could point out one thing which makes this case somewhat unusual, and perhaps also runs to the substantive reasonableness claims the defendant has raised, and perhaps also the prejudice claims on the procedural sentencing error assertions that he's made. The defendant has not challenged his conviction on count four, the conspiracy to launch weapons of mass destruction count. And that, for that count, he got a life sentence as well. Now, I understand this Court has unbundling cases which say that if one of the counts of conviction were to fall, he would presumptively be entitled to a resentencing. But so it's interesting for the defendant to complain about his life sentence or the way that Judge Pragerson went about determining that a life sentence was appropriate, when at the same time he seems perfectly willing to acquiesce to that life sentence, insofar as he's not challenging his conviction on count four at all. I wonder if that was a counsel-informed recommendation to the defendant in that case. I found that quite surprising. But as far as the going back to your question, Judge Scanlon, about this being a stiff sentence, the reality is that the defendant's actions led to the death of six people, including two civilians. And a life sentence is certainly less severe than a death sentence, even though people receive death sentences for killing others. And given the jury's finding that the defendant killed intentionally and deliberately he is a murderer. And a life sentence is not, in our view, too stiff for a murderer. I know there are a lot of issues in this case, but if the panel doesn't have any questions about them, I'm also happy to. Well, I go along with Judge O'Scanlon. I raised an eyebrow, I guess for historical reasons. In the 1880s and 1890s, the Cuban patriot, Jose Marti, was in Tampa. And he was trying to kill all sorts of Spaniards in Cuba. Was he violating 956A? It hadn't been enacted then. Well, you're correct, Judge Baha, that 956A had not been expanded to conspiracy to... I mean, doesn't America house revolutionaries who seek to uproot, especially in this case, former members of the Cambodian Khmer Rouge with all their killing in their background? Are we putting the wrong people in jail? I think in most cases we either prosecute them or we extradite them back to the country where the core violent acts took place. So you say it's a political decision? On some levels, any decision by the executives is informed by people who may be political insofar as my boss is Senate-confirmed and his boss is Senate-confirmed. But no, it's a decision based on whether a crime was committed. What's the just punishment? Where is the defendant going to get a fair trial? How will he be treated once in custody? Will he be treated unfairly if prosecuted in Cambodia and sent to a Cambodian prison? Is he better off here? All these things go into the mix. And as far as the suggestion by defendant that somehow our delay in bringing these charges politically motivated, there's just no evidence of that. The reality is that this was a complex case, as the court can tell from looking at the docket. There were SIPA proceedings which delayed things as well. So there were aspects of this case that went beyond the ordinary criminal investigation. And then there's also just the reality in U.S. attorneys are juggling their caseload, things start to move up towards the statute of limitations, and then we wake up and say, my gosh, we have to move quickly here. I mean, it's just a reality sometimes. Sotomayor, where would the decision have been made to prosecute Mr. Chun? Would that be at the Attorney General's level or would it be a U.S. attorney decision? I don't know. I don't want to misspeak. I don't know if it would have gone all the way to the Attorney General. I know that the National Security Division was involved in Washington with this case. For example, they mooted me for this argument and reviewed my brief. So I'm fairly confident with the Court inferring that the decision was made, including at the charging stage, at that level. But above that, I don't know. I don't know. Thank you. Anything further, counsel? No, unless the Court has further questions. No further questions. Thank you, counsel. Mr. Callahan, you have a fair amount of reserve time. Thank you. Before you get started, do you have any response to the observation that your client waived the weapons of mass destruction objection? Well, I wanted to start with that. If I understood the colloquy correctly, there is no challenge to the conviction on count four. It's pretty close, in my opinion, to a strict liability offense. And we are, however, just to, lest there be any misunderstanding, we're challenging the sentence on count four. I didn't want that to be misunderstood or if I was by, you know, a whole lot. Well, how can you challenge the sentence without challenging the conviction? You certainly can technically, but I'm just wondering what, I'm trying to understand what's below the surface here, because some things don't make sense. Well, I handled the trial and I'm handling the appeal. I frankly thought I would like to see that statute redrafted, but I didn't see a ground to challenge it on its face. But I did see a ground to challenge the sentencing, and that's why I'm here. All right. But I appreciate the clarification on that. And on what ground do you challenge the sentencing? That it's unreasonable, substantively unreasonable, and also procedurally. A conviction for conspiracy to use weapons of mass destruction, which is not appealed, the sentence is a life imprisonment, and that's unreasonable? What do we use as our touchstone for saying it's unreasonable? The circumstances of the offense. I mean, we have to go into 3553 factors. Tell me which 3553 factor you rely upon to say it's unreasonable to use weapons of mass destruction to kill people, to give a life sentence on it. Because in this particular case, there was no evidence adduced that there was an intent to kill anyone. Weapons were used, but they were with specific orders, only to use if necessary. This was a war situation for them. And what I'm saying in addition is, this is one aspect of the case, but in addition to that. Were orders given to kill anybody who got in the way? I'm sorry? Were orders given to kill anybody who got in the way of Operation Volcano? Only if absolutely necessary, there was an order. Well, necessary is in the eye of the beholder. The sentencing court relied heavily on the fact that a 15-year-old died and a civilian young father of young children died, and that it's appropriate to dissuade people from plotting deadly violence on American soil, plotting on American soil to commit deadly violence elsewhere. That that's the whole point of the statute, and that all these deaths occurred. And I have difficulty seeing the unreasonableness argument. Well, I appreciate the court's comment. I respectfully disagree in light of all the circumstances of this case. And the problem we have is motivation is not the motivation that was contemplated by 956A, or actually 956B and 960 either. Well, nobility is in the eyes of the beholder, and a just revolution is in the eyes of the beholder. And basically Congress has made a policy that we don't want, whatever our policy was in the 1800s, now our policy is we don't want people conspiring on American soil to be killing people elsewhere, that that's not okay. And so I'm not sure why the nobility of his cause or the suffering of his people comes into play in the legal analysis that we're required to make. It goes to the nature and circumstances of the defendant and the nature and circumstances of the offense under 3553. The way the statute is drafted, Judge Graber, and the way it's often interpreted, this case is an anomaly. This is something that had not been contemplated. The idea of equating a man's effort to save his homeland and to bring American democracy there is put on the same level as two jetliners going into the World Trade Center. They are different animals altogether. That's why I believe that the substantive reasonable argument is viable here. You have to look at all circumstances surrounding it. Yes, there were some unfortunate aspects. Yes, I don't like defending some of the actions that were taken. There's no question this was a difficult situation. But this is a case of six people. It was more than an unfortunate circumstance for sentencing purposes, and that's what the district court relied on, saying, I give him that his cause was noble, but that he still ended up, his acts and those of his compatriots ended up killing some innocent people. I understand, and that's why he was convicted in Cambodia and received a life sentence. This was a Cambodian case. We understand, I clearly understand the idea that the United States doesn't want people here plotting. But I think with that in mind, we have to also keep in mind, as difficult as it might seem sometimes, to recognize the distinction between our battles and Cambodia's battles. And the line I used at trial, or at least in hearings, rightly or wrongly, is, frankly, we didn't have a dog in this fight. Cambodia did. And they indicted him. They convicted him. He was not there, but there was conviction. That's where this case belongs, for the most part. It is allowed here. You mean in Cambodia, let the Cambodia courts deal with it. Is that what you're saying? This is where the deaths occurred. This is where the overthrow occurred. So you'd prefer, he would prefer to be in prison in Cambodia now for the rest of his life versus here? I'm just saying, well, there's no expedition treaty, so it's sort of a moot point. I mean, that's another aspect of this case. I mean, we were never on good diplomatic relations with Cambodia and still aren't. Counsel, what do you make of the government's concession that if this were Syria, things would be different? Can you give me a little more example on that, Your Honor? No, I'm just asking you, what's your observation? You heard my question. You heard the government's answer. Does that ring any bells for you or not? It may not. I'm just asking the question. Forgive me. I may have missed part of that answer, to be honest with you. Well, the government's argument is that Syria is different because there is an express congressional authorization for the use of military force by the United States against the government forces there and that there's nothing even remotely resembling hostilities between the United States and Cambodia. Even though there were not good diplomatic relations, there was no sort of hostility, and so any error in the instruction would be harmless. I took that to be their argument. So what's your response to that argument? You're talking about the Ad Fisa request? Yes. I would go back to the argument that I raised in the motion to eliminate opposition. The government wanted to preclude questioning by me of any State Department or government official as to covert activities. That's where this issue got started. The judge ruled against me on that and found that covert activities were irrelevant, and then he coined the phrase, it has to be open and notorious. That's why we're challenging the at-peace jury instruction, and as I put, if I can do as an aside here, the government's argued it's plain air. But I would ask if necessary for a supplemental brief just to incorporate the motion to eliminate because that's where the argument is laid out. I focused solely on the jury instruction, but it's set forth in great detail in the motion to eliminate. But I do think that covert activities, looking at the Terrell case and then recently the Jacks case, sets a good example as to just the illogic behind making open hostilities an element of the at-peace requirement. Thank you, counsel. Your time has expired. The case just argued will be submitted for decision, and the court will adjourn.
judges: O'scannlain, Graber, Bea